FILED
United States Court of Appeals
Tenth Circuit

September 30, 2025

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MICHAEL ANDRE CAMPBELL,

    Defendant - Appellant.

No. 23-6186

_____

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 5:22-CR-00138-HE-1)**

_____

Amy W. Senia, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with her on the briefs), Denver, Colorado, for Defendant-Appellant.

Daniel D. Gridley, Jr., Assistant United States Attorney (Robert J. Troester, United States Attorney, with him on the brief), Oklahoma City, Oklahoma, for Plaintiff-Appellee.

_____

Before **MATHESON**, **KELLY**, and **MORITZ**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.

_____

    In this direct criminal appeal, Michael Campbell challenges his conviction and 240-month sentence for being a felon in possession of a firearm. We first affirm the district court's order denying Campbell's motion to suppress, holding that the officer's reasonable suspicion had not dissipated at the time he frisked Campbell and

discovered the firearm. And based on binding circuit precedent, we reject Campbell's

argument that the felon-in-possession statute is unconstitutional. But we conclude

that the district court erred in sentencing Campbell under the Armed Career Criminal

Act (ACCA) of 1984, 18 U.S.C. § 924(e). Campbell's prior convictions for

Oklahoma armed robbery can be committed with a reckless state of mind as to the

force involved and therefore do not constitute violent felonies under the ACCA. So

although we affirm Campbell's conviction, we vacate his sentence and remand for

resentencing.

## Background[1]

Around 11:30 p.m. one night in July 2021, Teresa Cooper called 911 to report

that her home security camera was showing a Black man and woman taking items

from her back porch. About one minute after the conclusion of that call, Officer

Drew Mullinix arrived at the reported address, which was in a dimly lit residential

area. As Mullinix exited his patrol vehicle, he saw a Black man—who later identified

himself as Campbell—walking near some trash cans at the top of the driveway, near

the back of the residence. From the other end of the driveway, Mullinix identified

himself as law enforcement and instructed Campbell to come toward him.

Campbell did not comply with that instruction; instead, Campbell told

Mullinix that he lived at the residence and walked toward a car parked in the

---

[1] The parties do not dispute the facts of the underlying incident. We draw our description from testimony at the suppression hearing and from body-worn-camera footage.

driveway, facing the street, with the driver's door open. The two men then talked over each other, with Mullinix repeating his "come here" instruction four more times, and Campbell repeating that he lived there three more times. As Campbell approached the car, Mullinix walked toward Campbell, telling him to keep his hands up. Campbell put his hands up, and Mullinix noticed a black magazine sticking out of Campbell's waistband.[2] Mullinix then had to repeat the hands-up instruction twice more for Campbell to keep his hands up. During these exchanges, Campbell was standing behind the open car door and telling Mullinix that his dog was in the car. Campbell was also holding a hamburger in his left hand and wearing an orange polo shirt with a pair of glasses tucked into the neck.

When Mullinix reached the car, Campbell asked if he could give Mullinix his wallet, and Mullinix said, "Not yet." R. vol. 5, Ex. 2, at 1:04–1:06. Campbell asked Mullinix why he was on his property, and Mullinix said that someone called about seeing a burglary taking place. Campbell said that must have been his neighbor, whom he identified by name. Campbell also repeated that he lived at the residence and gave his full name. Mullinix said that he needed to "do [his] process" to verify that information. *Id.* at 1:25–1:27. In Campbell's desire to prove his place of residence, he repeatedly dropped his hands, prompting Mullinix to tell him to keep his hands up and to take Campbell by the arm throughout a back-and-forth exchange

---

[2] The magazine in Campbell's waistband is not visible in the video footage, but the district court found Mullinix's testimony on this point to be credible, and Campbell does not dispute as much on appeal.

3

that went on for about two minutes.

During this back-and-forth, Campbell repeated that this location was his home and confirmed that Mullinix's body-worn camera was on. Mullinix repeated that if this was Campbell's home, he'd check Campbell's identification and "figure it out." *Id.* at 2:21–2:23. Despite Mullinix's repeated directions not to reach for things, Campbell retrieved his wallet from his back pocket and handed it to Mullinix. Mullinix asked if Campbell had any weapons on him, Campbell responded in the negative, and Mullinix asked if he could check. But Campbell's only response was to say again that the property was his home and to ask about probable cause, a warrant, and the Fourth Amendment. Mullinix told Campbell that he had reasonable suspicion that a crime was being committed. Mullinix then attempted to look through Campbell's wallet with one hand while continuing to hold Campbell's arm with the other; he did not appear to find a driver's license. At the same time, Campbell provided the address of the residence and began describing his neighbors. Mullinix then said to Campbell, "Let me put you in my car, and we'll figure it out." *Id.* at 3:26–3:28.

Over the next two minutes, Mullinix and Campbell walked to the patrol vehicle at the end of the driveway, during which time Campbell continued to talk over Mullinix and to ignore commands until they were given several times. For instance, Campbell again tried to reach for his pockets despite Mullinix's repeated instructions not to reach for anything. Campbell then reiterated that his driver's license was in his wallet, which Mullinix had left on the hood of Campbell's car.

4

Mullinix responded that after he put Campbell in the patrol vehicle, he would find the driver's license, and if it matched the address at issue, Campbell would be free to go. Mullinix then told Campbell that the woman who lived at the residence had reported someone stealing things from the back porch, and Campbell replied that she was his wife, Teresa Cooper.

Before putting Campbell in the patrol vehicle, Mullinix frisked Campbell for weapons, and Campbell admitted he was armed. Mullinix took a gun from Campbell's waistband and a knife from his back pocket. After putting Campbell in the patrol vehicle, Mullinix called Cooper, who said that Campbell was her ex-husband and was allowed to be at the residence.[3]

Based on this incident, the government indicted Campbell for being a felon in possession of a firearm. Campbell moved to suppress the gun, arguing that Mullinix lacked reasonable suspicion to detain and frisk him. After a hearing, the district court denied the motion. Campbell went to trial and was convicted.

At sentencing, the district court adopted the presentence investigation report and set Campbell's sentencing range under the United States Sentencing Guidelines (the Guidelines) at 262 to 327 months in prison, based on a criminal-history category of VI and a total offense level of 34. Despite this range, the felon-in-possession statute's ten-year statutory maximum sentence would have capped Campbell's

---

[3] Before calling Cooper, Mullinix returned to Campbell's vehicle and quickly looked through the wallet again, but he again seemed not to find a driver's license.

sentence at 120 months. *See* 18 U.S.C. § 924(a)(2) (2022).[4] But the district court determined that the ten-year statutory maximum did not apply because Campbell qualified as an armed career criminal under the ACCA based on his five prior convictions for armed robbery in Oklahoma. This determination subjected Campbell to a 15-year mandatory minimum. *See* § 924(e). The district court ultimately sentenced Campbell to 240 months, a sentence below the Guidelines range, above the 15-year mandatory minimum, and twice the otherwise-applicable ten-year statutory maximum.

Campbell appeals.

## Analysis

Campbell challenges his conviction and sentence on several grounds. He first argues that Mullinix's reasonable suspicion dissipated early in their encounter, before the frisk for weapons, so the district court should have suppressed the firearm. He next argues, for preservation purposes, that the felon-in-possession statute is unconstitutional. As to his sentence, he contends that he does not fall within the ACCA's purview because his Oklahoma convictions for armed robbery do not qualify as ACCA predicates. We consider each argument in turn.

## I.    Suppression

Campbell first argues that the district court erred in denying his motion to

---

[4] Congress later increased the statutory maximum for 18 U.S.C. § 922(g) offenses to 15 years, but this change does not apply here. *See* Bipartisan Safer Communities Act, Pub. L. No. 117-159, sec. 12004(c), 136 Stat. 1313, 1329 (2022) (codified at 18 U.S.C. § 924(a)(2), (8)).

suppress. Reviewing that decision, we consider the evidence in the light most favorable to the prevailing party, assess factual findings for clear error, and analyze legal conclusions de novo. *United States v. Young*, 99 F.4th 1136, 1142 (10th Cir. 2023).

Suppression issues flow from the Fourth Amendment, which provides protection from "unreasonable searches and seizures," and the judicially created exclusionary rule, which prevents the government from using evidence obtained in violation of that constitutional guarantee. U.S. Const. amend. IV; *see also United States v. Braxton*, 61 F.4th 830, 834 (10th Cir. 2023) (explaining exclusionary rule). "The [g]overnment bears the burden of proving that a seizure is reasonable." *United States v. De La Cruz*, 703 F.3d 1193, 1196 (10th Cir. 2013). The type of seizure at issue in this case is an investigatory detention, which is more intrusive than a consensual encounter (not subject to the Fourth Amendment) and less intrusive than an arrest (requiring either a warrant or probable cause). *Young*, 99 F.4th at 1143. Assessing the reasonableness of an investigatory stop requires "a twofold inquiry." *Id.*

The first question is whether the officer has "reasonable suspicion that criminal activity may be occurring." *Id.* To evaluate reasonable suspicion, we "look at the totality of the circumstances." *Id.* "Reasonable suspicion requires 'more than an inchoate and unparticularized suspicion or hunch' but 'considerably less than proof of wrongdoing by a preponderance of the evidence.'" *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "As long as an officer has a particularized and

objective basis for suspecting an individual may be involved in criminal activity, he [or she] may initiate an investigatory detention." *Id.* (quoting *United States v. Pettit*, 785 F.3d 1374, 1379–80 (10th Cir. 2015)). And the officer may do so "even if it is more likely than not that the individual is *not* involved in any illegality"—that is, to have reasonable suspicion, an officer need not rule out the possibility of innocent conduct. *Pettit*, 785 F.3d at 1379–80 (quoting *United States v. Johnson*, 364 F.3d 1185, 1194 (10th Cir. 2004)).

At the second step of the inquiry, investigatory detentions "must be 'reasonably related in scope to the circumstances' prompting the stop." *Young*, 99 F.4th at 1143 (quoting *Terry v. Ohio*, 392 U.S. 1, 19–20 (1968)). This means that any "'investigative detention must be temporary and last no longer than is necessary to effectuate' the purpose of either dispelling or confirming the officer's reasonable suspicion." *De La Cruz*, 703 F.3d at 1197 (quoting *United States v. White*, 584 F.3d 935, 953 (10th Cir. 2009)). "Once reasonable suspicion has been dispelled, 'even a very brief extension of the detention without consent or reasonable suspicion violates the Fourth Amendment.'" *Id.* (cleaned up) (quoting *United States v. Burleson*, 657 F.3d 1040, 1045 (10th Cir. 2011)). For instance, we have held that reasonable suspicion premised on a suspected license-plate violation dissipated after the officer approached the vehicle on foot and "reasonably could have observed the registration number on the minivan's license plate." *United States v. Trestyn*, 646 F.3d 732, 742–43 (10th Cir. 2011); *see also, e.g., United States v. McSwain*, 29 F.3d 558, 561–62 (10th Cir. 1994) (holding that reasonable suspicion of license-plate violation was

8

"completely dispelled" when officer approached vehicle and saw that there was no such violation); *United States v. Pena-Montes*, 589 F.3d 1048, 1054, 1057–58 (10th Cir. 2009) (same). On the other hand, so long as reasonable suspicion is not clearly refuted, continued detention may be justified. *Amundsen v. Jones*, 533 F.3d 1192, 1200 (10th Cir. 2008) (holding that reasonable suspicion of drunk driving, based on weaving between lanes, continued through duration of field sobriety tests even though defendant's "behavior during the stop did not provide additional evidence of impairment" (cleaned up)).

Applying these principles, the district court concluded that Mullinix had reasonable suspicion to detain Campbell at the outset of the encounter, highlighting several facts: it was nighttime; Mullinix arrived a mere minute after the 911 call; Campbell matched the 911 caller's general description of a Black male; and Mullinix located Campbell near the backyard and driveway—exactly where someone stealing from the back porch might be. The district court next noted that Campbell "did not respond in a very cooperative way . . . to what [Mullinix] was directing him to do." R. vol. 3, 43. Given Campbell's response and the overall length of the detention, the district court ultimately concluded that "it was reasonable for [Mullinix] to detain [Campbell] in such a fashion that he could protect his own safety and stabilize the situation while he was trying to figure out what was going on" and for "long enough to conduct the limited investigation that occurred here." *Id.* at 44–45.

On appeal, Campbell doesn't dispute that Mullinix had reasonable suspicion to initiate the detention, but he inaccurately characterizes that suspicion as

9

"questionable," Aplt. Br. 17, and "extremely minimal," Rep. Br. 2. As the government asserts, the totality of the circumstances here easily satisfies the low bar of reasonable suspicion. Mullinix arrived at the residence about one minute after the conclusion of a 911 call from the homeowner herself, who reported a Black man (and woman) stealing items from her back porch. *See United States v. Fisher*, 597 F.3d 1156, 1159 (10th Cir. 2010) (finding reasonable suspicion to detain defendant sitting in vehicle parked in driveway of residence at which 911 caller had reported gunfire three minutes earlier); *United States v. Madrid*, 713 F.3d 1251, 1258–59 (10th Cir. 2013) (discussing methods of assessing reliability of tipsters). And upon arrival, Mullinix saw Campbell, who is a Black man and thus matched the caller's general description, just steps away from the back of the house where the reported criminal activity was occurring. *Cf. United States v. Conner*, 699 F.3d 1225, 1231 (10th Cir. 2012) (noting "temporal and geographic association" in support of reasonable suspicion (cleaned up)). What's more, the incident occurred just before midnight in a poorly lit area. *See United States v. McHugh*, 639 F.3d 1250, 1257 (10th Cir. 2011) (noting that time of night contributes to reasonable suspicion). These facts combined to create reasonable suspicion that Campbell was engaged in criminal activity.[5]

---

[5] Campbell repeatedly emphasizes the generality of the caller's description to imply that he was detained based solely on his race. To be sure, "race, when considered by itself and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop." *United States v. Swindle*, 407 F.3d 562, 569–70 (2d Cir. 2005). But in *Swindle*, the Second Circuit held that officers lacked reasonable suspicion to detain a man who entered and then exited a known drug house because he "was simply a [B]lack man in a high-crime area driving a car that [a] wanted fugitive had previously been seen 'near.'" *Id.* at 570. Here, by contrast,

At the second step of the investigatory-detention inquiry, Campbell contends that Mullinix's reasonable suspicion dissipated over the course of the encounter, before the patdown that revealed the gun at issue.[6] In support, he emphasizes that when Mullinix arrived on scene, Campbell did not attempt to flee, that his appearance did not suggest burglary, and that he had parked his car with the door open and his pit bull inside. Campbell also notes that he repeatedly told Mullinix that he lived at the residence and tried to prove as much by providing his wallet, the address, the names of neighbors, and the name of the 911 caller.

In focusing on his appearance[7] and the fact that he did not flee, Campbell ignores that officers "need not rule out the possibility of innocent conduct" when assessing reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 277 (2002);

---

Mullinix did not detain Campbell only because he is a Black man and thus matched the caller's general description—he detained Campbell because his presence was consistent with the homeowner's description of the individual, the location, and the time of the crime.

   [6] Campbell does not dispute that the patdown itself was reasonable for officer-safety purposes. Instead, he contends that the underlying detention itself was not reasonable and should have stopped prior to the patdown.

   [7] In his reply brief, Campbell cites *United States v. Daniels*, 101 F.4th 770 (10th Cir. 2024), to support his assertion that his brightly colored shirt should have dispelled the officer's reasonable suspicion that he was the burglar reported just a minute before by the homeowner. Certainly, we did note in *Daniels* that "a bright, eye-catching orange jumpsuit . . . seem[ed] to be a somewhat counterintuitive fashion choice for someone committing, or about to commit, a crime and hoping to get away with it." *Id*. at 783. But importantly, in *Daniels*, the anonymous tipster had identified the suspicious individuals getting in and out of a dark SUV, *wearing dark clothing*, and openly carrying guns. *Id.* at 782. Yet when officers arrived, they observed the defendant standing near a dark SUV, wearing bright orange clothing, and carrying no weapon. *Id.* As such, *Daniels* doesn't lend Campbell much assistance. Certainly, Campbell's attire was part of the totality of the circumstances here. But unlike *Daniels*, his clothing choice wasn't inconsistent with the caller's description.

*see also Pettit*, 785 F.3d at 1379–80. What's more, he fails to consider the totality of the circumstances as viewed from the perspective of a reasonable officer, which include that Mullinix arrived at the home within one minute of a call from the homeowner and found Campbell a few steps from the back of the house, where the homeowner had reported a suspected burglary. Further, Campbell fit the homeowner's description of the suspect, and Mullinix believed, based on the magazine he saw in Campbell's waistband, that he was armed. Moreover, Campbell was uncooperative in responding to the officer's directions.

Regarding this last point, Campbell suggests that his uncooperative and argumentative conduct "merely underscored the veracity of [his] story under the circumstances" and "was in no way indicative of hi[s] committing a burglary." Aplt. Br. 20–21. But a reasonable officer could view an argumentative and uncooperative detainee who he reasonably believed was carrying a gun as worthy of continued suspicion, even if that lack of cooperation could also be consistent with innocence. *See United States v. Briggs*, 720 F.3d 1281, 1286 (10th Cir. 2013) ("[A] suspect's evasive . . . movements are considered as part of the totality of the circumstances that may justify a detention.").

This is particularly true given that the district court found Mullinix's testimony—that he had immediately seen a black magazine sticking out of Campbell's waistband and he suspected Campbell was carrying a gun—to be credible. Campbell fails to challenge that conclusion as clearly erroneous. He instead contends that the presence of the gun is not relevant to reasonable suspicion, noting

12

that we recently declined to "look with suspicion on citizens presumably exercising their Second Amendment rights in a lawful way." *Daniels*, 101 F.4th at 778. Yet in context, this statement from *Daniels* doesn't apply here. There, officers were responding to an anonymous report of three Black men wearing dark clothing in a parking lot and getting in and out of SUVs while carrying guns. *Id.* We noted the Second Amendment when characterizing this reported activity as "not obviously illegal." *Id.* Here, by contrast, Mullinix reasonably suspected Campbell of committing burglary, which is obviously illegal. And when Mullinix noticed the magazine in Campbell's waistband, he reasonably suspected that Campbell may have been carrying a gun in furtherance of the burglary, rather than simply exercising his Second Amendment rights. *See Young*, 99 F.4th at 1146 (agreeing with government that possessing gun can contribute to reasonable suspicion in certain circumstances); *Briggs*, 720 F.3d at 1289 ("At the very least, in the circumstances facing the officers in this case, the presence of a concealed weapon would heighten reasonable suspicion that criminal activity was afoot.").

We also reject Campbell's argument that Mullinix had a duty to quickly confirm Campbell's identity and address by immediately locating Campbell's driver's license or calling the 911 caller. Campbell draws this argument from our observation in *Trestyn* that the officer approaching the vehicle "reasonably *could have* observed the registration number." 646 F.3d at 743 (emphasis added). But we made this statement in the context of an officer conducting a simple traffic stop premised on a license-plate violation, and any reasonable officer in that situation

13

would likely look first to the license plate at issue. Here, by contrast, Mullinix reasonably suspected that Campbell had just committed a burglary and that he was armed. So Mullinix was reasonably concerned for his own safety when Campbell ignored his directions, was argumentative, and attempted to reach for his pocket or to get into his car. Nothing in *Trestyn* required him to review Campbell's driver's license before securing him. In sum, because Mullinix's initial reasonable suspicion had not dissipated at the time he frisked Campbell, the district court did not err in denying the suppression motion.

## II.    Constitutionality of 18 U.S.C. § 922(g)(1)

Next, Campbell contends (for preservation purposes) that § 922(g)(1) is unconstitutional under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024). We recently rejected this argument. *Vincent v. Bondi*, 127 F.4th 1263, 1264 (10th Cir. 2025). And because "[w]e are bound by the precedent of prior panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court," we reach the same result here. *United States v. Manzanares*, 956 F.3d 1220, 1225 (10th Cir. 2020) (quoting *In re Smith*, 10 F.3d 723, 724 (10th Cir. 1993)).

## III.    ACCA

Turning now to Campbell's sentence, he contends that his five prior convictions for Oklahoma armed robbery do not constitute violent felonies under the ACCA. We typically review de novo whether prior convictions constitute ACCA predicates. *United States v. Degeare*, 884 F.3d 1241, 1245 (10th Cir. 2018).

14

However, because Campbell did not raise below the argument that he presents on appeal, we review only for plain error, under which Campbell must show (1) an error that (2) is plain, (3) affects his substantial rights, and (4) "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Venjohn*, 104 F.4th 179, 183 (10th Cir. 2024) (quoting *United States v. Moore*, 30 F.4th 1021, 1025 (10th Cir. 2022)).

As relevant here, the ACCA imposes a 15-year mandatory minimum on anyone "who violates [18 U.S.C. §] 922(g) . . . and has three previous convictions . . . for a violent felony." 18 U.S.C. § 924(e)(1). The ACCA proffers several definitions of "violent felony," but the one that matters here is the elements clause.[8] The ACCA's elements clause defines "violent felony" as an offense that "has as an element the use, attempted use, or threatened use of physical force against the person of another." § 924(e)(2)(B)(i). And a plurality of the Supreme Court recently held that a crime encompassing a reckless use of force does not satisfy the elements clause because "[t]he phrase 'against another,' when modifying the 'use of force,' demands that the perpetrator direct his action at, or target, another individual." *Borden v.*

---

[8] The ACCA also has an enumerated clause providing that "burglary, arson, [and] extortion," are violent felonies, as are offenses that "involve[] use of explosives." § 924(e)(2)(B)(ii). Additionally, the ACCA includes a now-defunct residual clause purporting to encompass any offense that "otherwise involves conduct that presents a serious potential risk of physical injury to another," *id.*, which the Supreme Court held unconstitutionally vague in *Johnson v. United States*, 576 U.S. 591 (2015).

*United States*, 593 U.S. 420, 429 (2021).[9] In other words, the phrase "against another" "sets out a mens rea requirement—of purposeful or knowing conduct." *Id.* at 434 (cleaned up).

In light of *Borden*, Campbell argues that Oklahoma armed robbery doesn't qualify as a violent felony because it can be committed with reckless use of force and thus does not satisfy the mens rea requirement.[10] To determine whether he's correct that his prior convictions don't constitute violent felonies under the ACCA's elements clause, "we apply the categorical approach, focusing on the elements of the crime of conviction, not the underlying facts."[11] *United States v. Deiter*, 890 F.3d

---

[9] We have held that the plurality decision in *Borden* is binding. *United States v. Kepler*, 74 F.4th 1292, 1302 n.11 (10th Cir. 2023).

[10] Below, Campbell advanced a different argument: that Oklahoma armed robbery was not a violent felony because it could be committed without the requisite level of force. *See Johnson v. United States*, 559 U.S. 133, 140 (2010) (defining the ACCA's term "physical force" to "mean[] *violent* force—that is, force capable of causing physical pain or injury to another person"); *Stokeling v. United States*, 586 U.S. 73, 87 (2019) (explaining that ACCA's physical force "includes the amount of force necessary to overcome a victim's resistance"). The district court relied on unpublished Tenth Circuit caselaw to reject Campbell's violent-force argument. *See, e.g.*, *United States v. Villanueva*, 786 F. App'x 771, 773–74 (10th Cir. 2019) (holding that Oklahoma robbery was violent felony under ACCA elements clause because Oklahoma courts have "interpreted the statutory language as requiring a level of force sufficient to overcome a victim's resistance"). Because Campbell does not renew his violent-force argument on appeal, we need not address it. But we pause to note that our prior unpublished decisions—holding that Oklahoma robbery satisfied the ACCA's elements clause—are not binding on us here both because they are unpublished and because they neither considered nor answered the recklessness question that Campbell raises now.

[11] For criminal statutes that are divisible, courts apply a modified categorical approach that permits a limited review of certain underlying documents to determine which portion of a divisible statute a defendant was convicted of violating. *See Degeare*, 884 F.3d at 1246. Because no one argues that Oklahoma's armed-robbery statute is divisible, we assume it is not and thus apply the pure categorical approach.

1203, 1211 (10th Cir. 2018) (quoting *United States v. Harris*, 844 F.3d 1260, 1263 (10th Cir. 2017)). "The categorical approach focuses on the minimum conduct criminalized by the state statute . . . ." *United States v. Mendez*, 924 F.3d 1122, 1126 (10th Cir. 2019). "If some conduct that would be a crime under the statute would not be a violent felony under the ACCA, then any conviction under that statute will not count toward an ACCA enhancement, regardless of whether the conduct that led to the defendant's prior conviction was in fact violent." *United States v. Titties*, 852 F.3d 1257, 1265 (10th Cir. 2017).

That said, the categorical approach "is not an invitation to apply legal imagination to the state offense." *Mendez*, 924 F.3d at 1126 (cleaned up) (quoting *Moncrieffe v. Holder*, 569 U.S. 184, 191 (2013)). Instead, "there must be 'a realistic probability, not a theoretical possibility, that the [s]tate would apply its statute to conduct that falls outside the generic definition of a crime.'" *Id.* (quoting *Moncrieffe*, 569 U.S. at 191). A defendant can establish this realistic probability through the statute's plain language and the state's interpretive caselaw or, in certain circumstances, by providing examples of actual prosecutions of conduct that does not meet the ACCA's definition of a violent felony. *See id.* (rejecting defendant's hypotheticals and requiring prosecutorial examples where plain language of statute didn't criminalize conduct outside ACCA's definitions); *Titties*, 852 F.3d at 1274–75

---

*See United States v. Bowen*, 936 F.3d 1091, 1102 n.5 (10th Cir. 2019) (assuming without deciding that statute was indivisible and applying pure categorical approach because neither party argued divisibility).

(concluding that no prosecutorial examples were necessary where plain language of statute criminalized conduct outside ACCA's definitions); *cf. United States v. Taylor*, 596 U.S. 845, 857–58 (2022) (rejecting government's prosecutorial-example argument because categorical approach "doesn't ask whether the crime is *sometimes* or even *usually* associated with" the use of force defined by the ACCA but instead "asks whether the government must prove, as an *element* of its case, the use, attempted use, or threatened use of force" against another).

Here, Campbell had five prior convictions for Oklahoma armed robbery, and that statute makes it a felony to rob or attempt to rob any person or inhabited place "with the use of any firearms or any other dangerous weapons." Okla. Stat. tit. 21, § 801. Oklahoma then defines "robbery" as "a wrongful taking of personal property in the possession of another, from [their] person or immediate presence, and against [their] will, accomplished by means of force or fear." *Id.* § 791. And "the force or fear must be employed either to obtain or retain possession of the property, or to prevent or overcome resistance to the taking," not "merely as a means of escape." *Id.* § 792. As Campbell highlights and as the government does not dispute, this statutory text "is silent as to any required mental state," Aplt. Br. 30, as is the state's pattern jury instruction for this offense, Okla. Unif. Jury Instrs. Crim. 4-144 (2d ed. 2024), http://okcca.net/ouji-cr/4-144/ (last visited Aug. 29, 2025).

Consistent with this silence, the Oklahoma Court of Criminal Appeals (OCCA) has long held that armed robbery has no required mental state. In 1952, the OCCA rejected a robbery defendant's argument that the trial court should have instructed the

18

jury to find that he intended to permanently deprive the owner of the vehicle he stole. *Traxler v. State*, 251 P.2d 815, 824–38 (Okla. Crim. App. 1952). To so hold, the OCCA determined that Oklahoma's robbery statute does not incorporate the common-law requirement of "felonious intent," meaning "intent to permanently deprive." *Id.* at 828–31, 836. Instead, the OCCA held that Oklahoma's statutory definition of robbery requires only a "wrongful taking"—"*any* taking of personal property against the will of the possessor." *Id.* at 836 (emphasis added). Thus, the OCCA concluded that the statute does not "make intention a necessary element of robbery," a crime for which "[n]o state of mind or belief is involved." *Id.*

In the intervening years, the OCCA has continued to rely on *Traxler* for the proposition that robbery does not require any specific intent and is, instead, a general-intent crime. *See Fletcher v. State*, 364 P.2d 713, 714, 721–22 (Okla. Crim. App. 1961) (rejecting argument that Oklahoma robbery requires specific intent to steal); *Langdell v. State*, 657 P.2d 162, 165 (Okla. Crim. App. 1982) (rejecting argument that Oklahoma attempted robbery requires instruction on "the requisite intent" beyond reciting the statutory text); *Hammon v. State*, 999 P.2d 1082, 1098 (Okla. Crim. App. 2000) (describing robbery as general-intent crime). And crucially for our purposes, Oklahoma general-intent crimes can typically be accomplished with as little as reckless conduct.[12] *See Quinn v. State*, 485 P.2d 474, 476 (Okla. Crim.

---

[12] This is consistent with the Model Penal Code, which provides that "[w]hat the common law would traditionally consider a 'general intent' crime . . . encompasses crimes committed with purpose, knowledge, *or recklessness*." *United*

App. 1971) (explaining that "to constitute a crime[,] the act must . . . be accompanied by a criminal intent on the part of the accused, or by such negligent and reckless conduct and indifference to the consequences of conduct as is regarded by law as equivalent to a criminal intent").

This caselaw strongly indicates that Oklahoma armed robbery requires no specific intent of any kind, is a general-intent crime that can be committed with as little as a reckless use of force, and thus does not constitute a violent felony under the ACCA's elements clause. But the government and the dissent resist this conclusion, insisting that *Traxler*'s mens rea holding is limited to the felonious-intent issue. According to both the government and the dissent, *Traxler* does not hold that robbery is a general-intent crime for all elements. Under this view, Oklahoma robbery is not a crime that a person can commit recklessly.

We don't disagree that *Traxler* answered a particular question about felonious intent, but the government and the dissent overlook both the breadth of *Traxler*'s holding—"[o]ur statute *does not in terms* make intention a necessary element of robbery," 251 P.2d at 836 (emphasis added)—and the later OCCA cases that do not limit such language.[13] Indeed, we recently rejected a similar attempt to dissect and

---

*States v. Zunie*, 444 F.3d 1230, 1235 (10th Cir. 2006) (emphasis added) (citing Model Penal Code § 2.02(3)).

[13] The dissent emphasizes that the later OCCA cases, like *Traxler*, did not involve the precise question before us. But the point of those later cases is not that they independently establish Oklahoma robbery as a crime that can be committed recklessly. We instead rely on these later cases to show that Oklahoma has not stepped back from the breadth of *Traxler*'s holding.

narrow a state supreme court's holding about the meaning of a state statute when assessing whether a state conviction constituted an ACCA predicate after *Borden*. *See United States v. Sjodin*, 139 F.4th 1188, 1202–04 (10th Cir. 2025). *Sjodin* involved a California assault statute and caselaw from the state supreme court holding that assault did not require specific intent to harm. *Id.* at 1202–03. We rejected the government's argument that the state caselaw set a state-of-mind requirement only for one element of the crime (the consequences of physical force), thus leaving the use-of-force element with a different state of mind. *Id.* at 1203. Instead, we agreed with the defendant that the caselaw clearly set out a single state of mind for the offense—no dissection necessary. *Id.* at 1203–04. *Traxler* does the same for Oklahoma armed robbery.[14]

Not to be deterred, the government next points to *Traxler*'s statement that, for Oklahoma robbery, "no intent is necessary *except the intention of doing the act denounced by the statute*." 251 P.2d at 836 (emphasis added). In the government's view, "the act denounced by the statute," *id.*, is "the use of force or fear to overcome the resistance of the victim," Aplee. Br. 35. But that misreads *Traxler*, which indicates that the act denounced by the statute is a wrongful taking. *See* 251 P.2d at 836. With that understanding, the government's position collapses. *See Sjodin*, 139

---

[14] The dissent finds *Sjodin* unavailing primarily because it involved a California assault statute rather than Oklahoma's robbery statute. But the specific statute analyzed in *Sjodin* is of no import to our analysis here. We rely on *Sjodin* not for its views on California law but for its interpretive approach, refusing to parse state caselaw more closely than is warranted.

F.4th at 1203 (holding that California assault did not satisfy Guidelines' crime-of-violence elements clause because state supreme court interpreted statute to "merely require[] an intent to do the act that results in harm" and "mere volition does not prove the intent to apply force to another person").

And even if we were to accept the government's conception of the act denounced by the statute, the government fails to establish that the use of force or fear must be something more than reckless under Oklahoma law. Rather than citing Oklahoma law to support the proposition that Oklahoma robbery requires the intentional use of force or fear, the government instead invokes federal caselaw holding that federal bank robbery is a general-intent crime that satisfies the elements clause. *See Carter v. United States*, 530 U.S. 255, 268 (2000) (holding that federal bank robbery "requir[es] proof of *general intent*—that is, that the defendant possessed knowledge with respect to the *actus reus* of the crime (here, the taking of property of another by force and violence or intimidation)"); *Deiter*, 890 F.3d at 1213–04 (holding that federal bank-robbery statute "requires more than mere recklessness or negligence"); *United States v. Wilson*, 880 F.3d 80, 87–88 (3d Cir. 2018) (holding that federal bank robbery required knowing conduct sufficient for purposes of elements clause). But these federal authorities interpreting a federal statute can't negate Oklahoma's own caselaw, which demonstrates that Oklahoma robbery can be committed with a reckless use of force.

Oklahoma's robbery caselaw likewise forecloses the government's position that Campbell's argument fails for want of any actual prosecutions of Oklahoma

22

reckless-force robbery. *See Titties*, 852 F.3d at 1274–75; *Taylor*, 596 U.S. at 857–58. Actual prosecutions are not required under these circumstances. Moreover, reckless-force robbery is not a far-fetched idea that is merely the product of "legal imagination."[15] *Mendez*, 924 F.3d at 1126 (quoting *Moncrieffe*, 569 U.S. at 191). In *People v. Anderson*, for instance, the California Supreme Court held that California robbery—which, like Oklahoma robbery, prohibits taking property from the person or presence of another by use of force or fear—requires only "that the perpetrator exert some quantum of force," not that the perpetrator do so with an intent or a purpose to harm. 252 P.3d 968, 970–72 (Cal. 2011). As such, *Anderson* affirmed a robbery conviction based on facts showing that the defendant stole an unlocked car from a parking lot and either accidentally or recklessly hit the car's owner while driving away.[16] *Id.* at 970–71.

---

[15] By the count of one district court, although reckless-force robbery is a minority view, it may exist in at least ten states. *See [Redacted] v. [Redacted]*, No. [Redacted], 2022 WL 4546737, at *11–15 (D.D.C. Aug. 29, 2022) (unpublished). To be sure, the dissent correctly notes that *[Redacted]* also listed Oklahoma as a state that has not yet clarified the state of mind required for robbery. *Id.* at *14. But *[Redacted]*'s brief description of Oklahoma law appears in the context of a nationwide survey of state robbery laws; it cites only § 791 and doesn't discuss *Traxler* or other cases we have relied upon here. Moreover, it doesn't consider our analysis of Oklahoma caselaw or our conclusion that Oklahoma's caselaw imposes no state of mind for robbery.

[16] The dissent does not discuss *Anderson*, and the government's attempt to distinguish it is unpersuasive. The government contends that Oklahoma, purportedly unlike California, requires that a defendant use or threaten force to take or retain the property, not merely to escape. But although the defendant in *Anderson* hit the vehicle's owner while driving away, the California court specifically noted that this use of force was not only to escape, but also to retain the stolen vehicle. 252 P.3d at 995.

23

Based on *Anderson*, the Ninth Circuit held that California robbery is categorically not a violent felony under the ACCA's elements clause. *United States v. Dixon*, 805 F.3d 1193, 1197–98 (9th Cir. 2015). We reach the same conclusion here, grounded in the OCCA's view that Oklahoma's robbery "statute does not in terms make intention a necessary element of robbery," *Traxler*, 251 P.2d at 836, and that Oklahoma general-intent crimes can be committed recklessly, *see Quinn*, 485 P.2d at 476. Because Oklahoma robbery can be committed with a reckless use of force, it criminalizes conduct that would not constitute a violent felony under the ACCA's elements clause. *See Borden*, 593 U.S. at 429; *Titties*, 852 F.3d at 1265. The district court thus erred in classifying Campbell's Oklahoma armed-robbery convictions as predicate violent felonies under the ACCA.

However, because we remain under plain-error review, the next question is whether this error was plain, meaning "clear or obvious under current, well-settled law." *Venjohn*, 104 F.4th at 186 (quoting *United States v. Cantu*, 964 F.3d 924, 935 (10th Cir. 2020)). In this context, we must consider both whether federal law plainly requires the intentional use of force for a conviction to qualify as a violent felony under the ACCA's elements clause and whether Oklahoma law plainly provides that robbery can be committed by the reckless use of force. *See id.* at 186–88 (examining both federal and state law on plainness "[b]ecause the categorical approach is an inherently comparative exercise"). The government concedes that under *Borden*, the ACCA's elements clause plainly requires the intentional use of force. But it disputes that Oklahoma law plainly permits convictions of reckless-force robbery.

24

To support its position, the government first cites *United States v. Carr*, 107 F.4th 636 (7th Cir. 2024). There—despite holding that Illinois armed robbery constituted a crime of violence under the enumerated clause of the Guidelines—the Seventh Circuit considered (seemingly in dicta) the defendant's unpreserved *Borden* recklessness argument under plain error. *See id.* at 641–42, 646–47. It noted that because Illinois law at the time classified robbery as a general-intent crime, it was possible that a defendant could have been convicted of robbery based on a use of force that "was merely reckless as opposed to knowing or intentional." *Id.* at 647. But the Seventh Circuit held that it was not obvious which robbery element—the taking element or the force element—a defendant could commit with a reckless state of mind. *Id.* And because it was possible, as confirmed by Illinois's pattern instruction, that recklessness applied *only* to the taking element, the Seventh Circuit concluded that any error was not plain. *Id.* But this case is different from *Carr* because we have found no Oklahoma authority suggesting or establishing that, contrary to *Traxler*, the use or threat of force for robbery must be knowing or intentional.[17]

---

[17] At best, the government invokes two Oklahoma cases involving unconscious victims. But, as Campbell points out, these unconscious-victim cases "do not make purposeful force a universal requirement" and instead merely establish "one way to commit robbery that requires purposeful force." Rep. Br. 25; *see also Mitchell v. State*, 408 P.2d 566, 571 (Okla. Crim. App. 1965); *Smith v. State*, 519 P.2d 1370, 1374 (Okla. Crim. App. 1974). The government's reliance on *Parnell v. State*, 389 P.2d 370 (Okla. Crim. App. 1964), is similarly unpersuasive. There, the victim testified that the defendants had agreed to work on her attic for $25 but then asked her to pay $600 when the work was done; she said she was so afraid of the defendants that she gave them the money, although they never yelled or threatened her. *Id.* at 372. The OCCA reversed the defendants' robbery convictions, holding that there was insufficient evidence of coercion or intimidation because a victim's fear

The government also invokes *United States v. Fagatele*, 944 F.3d 1230 (10th Cir. 2019). There, we held that the district court did not plainly err in classifying Utah third-degree aggravated assault as a crime of violence under the elements clause in the Guidelines. *Id.* at 1240. In so doing, we analyzed the defendant's reliance on a state-court decision and concluded that although the decision "contain[ed] some ambiguous language, it d[id] not clearly or obviously demonstrate that a defendant c[ould] violate [the state statute] with a mens rea less than" that required for crimes of violence. *Id.* Here, by contrast—and contrary to the dissent's point of view—*Traxler*'s language is not ambiguous: it clearly and obviously states that "[n]o state of mind or belief is involved" in Oklahoma robbery. 251 P.2d at 836. Moreover, the other Oklahoma caselaw already discussed—*Langdell*'s broad reading of *Traxler* to reject an argument that the jury should have been instructed on intent, *Langdell*, 657 P.2d at 165; *Hammon*'s description of robbery as a general-intent crime, 999 P.2d at 1098; and *Quinn*'s acknowledgment that general-intent crimes can be committed recklessly, 485 P.2d at 476—distinguish this situation from the uncertainty that existed in *Fagatele*. We thus conclude that the error was plain. *See Sjodin*, 139 F.4th at 1203 (relying on state interpretative caselaw to hold that California assault statute could plainly be violated by reckless use of force).

---

must be objectively reasonable. *Id.* at 374–75. That is why the OCCA said—to pull the quote cherry-picked by the government—"[i]ntimidation in the law of robbery means putting in fear, and the fear must arise from the conduct of the accused rather than the mere temperamental timidity of the victim." *Id.* at 375 (quoting *United States v. Baker*, 129 F. Supp. 684, 685 (S.D. Cal. 1955))). *Parnell* is thus a case about a victim's state of mind, not a defendant's.

Having found a plain error, the third and fourth prongs of plain-error review do not require discussion: the government does not dispute that if there is plain error, the third and fourth prongs of the test require reversal. *See Titties*, 852 F.3d at 1275 (vacating sentence and remanding based on "per se, reversible, plain error" of being illegally sentenced as armed career criminal without the requisite predicate convictions (quoting *United States v. Gonzalez-Huerta*, 403 F.3d 727, 739 n.10 (10th Cir. 2005))). We accordingly vacate Campbell's sentence and remand for resentencing.[18]

## Conclusion

Because the officer's reasonable suspicion had not dissipated by the time he frisked Campbell for weapons, the district court did not err in denying Campbell's motion to suppress. For this reason, and because the felon-in-possession statute is constitutional under binding precedent, we affirm Campbell's conviction.

But the district court plainly erred in counting Campbell's prior convictions for Oklahoma armed robbery as violent felonies under the ACCA; Oklahoma armed robbery can be committed with a reckless use of force and is therefore not a categorical match for the ACCA's elements clause. So we vacate Campbell's sentence and remand for resentencing.

---

[18] We need not reach Campbell's argument that the district court erred in calculating his Guidelines sentencing range. But we note that the government concedes this error, agreeing that Campbell's Oklahoma armed-robbery convictions do not constitute crimes of violence under the applicable Guidelines.

No. 23-6186, United States v. Michael Andre Campbell

**KELLY**, Circuit Judge, concurring in part and dissenting in part.

I concur in the court's opinion with the exception of Part III holding that the district court committed plain error in sentencing Mr. Campbell under the ACCA. I disagree with the court's conclusion that Mr. Campbell's five previous convictions for Oklahoma armed robbery cannot constitute violent felonies under the elements clause of the ACCA because they can be committed recklessly under the categorical approach.

To meet our rigorous test for plain error when applying the categorical approach, Mr. Campbell must demonstrate that the district court's error was clear or obvious under well-settled law of the Tenth Circuit or the Supreme Court, or that the language of the Oklahoma statute is clearly or obviously limited to the interpretation he advances. United States v. Fagatele, 944 F.3d 1230, 1239 (10th Cir. 2019). Reliance on ambiguous language in state court decisions is insufficient to satisfy this test. See id. at 1240.

The categorical approach "requires more than the application of legal imagination to a state statute's language." United States v. Babcock, 40 F.4th 1172, 1181 (10th Cir. 2022) (quoting Gonzales v. Duenas-Alvarez, 549 U.S. 183, 193 (2007)). Rather, "[i]t requires a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of a crime." Id. (quoting Gonzales, 549 U.S. at 193).

Oklahoma's statute for armed robbery states in relevant part that "[a]ny person or persons who, with the use of any firearms or any other dangerous weapons . . . attempts to rob or robs any person or persons" shall be punished by imprisonment for life or a term

not less than five years.  Okla. Stat. tit. 21, § 801.  Oklahoma further defines robbery as "a wrongful taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."  Id. § 791.  "To constitute robbery, the force or fear must be employed either to obtain or retain possession of the property, or to prevent or overcome resistance to the taking."  Id. § 792.

Mr. Campbell cannot point to well-settled law of the circuit or Supreme Court directly supporting his claim.  And contrary to this court's disposition, neither the statute nor the caselaw clearly or obviously support the idea that the robbery can be committed by the negligent or reckless use of force.  Mr. Campbell and the court rely heavily on Traxler v. State, 251 P.2d 815 (Okla. Crim. App. 1952), and subsequent cases, none of which directly apply to the challenge here.  In Traxler, the OCCA decided that the Oklahoma robbery statute did not incorporate an element of felonious intent, an intent to steal, and overruled Johnson v. State, 218 P. 179 (Okla. Crim. App. 1923), which had held to the contrary.  Traxler, 251 P.2d at 835–36.  Johnson declared that if a person held a bona fide belief that the property was his, it could not be robbery, even if accomplished with violence or fear.  218 P. at 181.

In Traxler, the appellate court rejected a challenge that the word "wrongful" in § 791 required an intent to permanently deprive the owner of the property where the defendant claimed that he only intended a temporary deprivation to escape law enforcement officers.  251 P.2d at 836–37.  The court stated:

2

It would seem from the use of the word 'wrongful' that our definition is more limited than the common law definition and that no intent is necessary except the intention of doing the act denounced by the statute. The word 'wrongful' imports in its terms the infringement of some right, and 'wrongful taking' would seem to be any taking of personal property against the will of the possessor, and if accomplished by means of force or fear it is robbery. No state of mind or belief is involved. It is the infringement of the right that makes the act wrongful,—something of more value than property is involved. It is the violation of that fundamental right so much cherished in free nations, 'of life, liberty and the pursuit of happiness', and where such rights are violated in the respect stated, <u>coupled with violent means and method employed</u> makes the act recited robbery, so far as defined by our statute.

<u>Id.</u> at 836 (emphasis added). The court simply had no occasion to consider whether negligence or recklessness could satisfy the requirement that the taking be accomplished "by means of force or fear."

The other Oklahoma cases relied upon by this court are no more helpful. In <u>Fletcher v. State</u>, 364 P.2d 713 (Okla. Crim. App. 1961), the court rejected a claim that the jury instructions required a statement that the property must have been taken with felonious intent — i.e., an intent to steal — following <u>Traxler</u>. 364 P.2d at 721–22. In <u>Langdell v. State</u>, 657 P.2d 162 (Okla. Crim. App. 1982), the OCCA indicated that for <u>attempted</u> robbery, no specific intent to commit robbery is required and that the language of the statute, which does not require felonious intent, is sufficient to convict. 657 P.2d at 165. Finally, in <u>Hammon v. State</u>, 999 P.2d 1082 (Okla. Crim. App. 2000), the OCCA considered an ineffective assistance claim and merely speculated that trial counsel may not have raised a voluntary intoxication defense to felony murder during robbery with a dangerous weapon because robbery is a general intent crime. 999 P.2d at 1098.

3

The linchpin of the analysis, Quinn v. State, 485 P.2d 474 (Okla. Crim. App. 1971), rejected the claim that specific intent to harm the victim was required for a conviction for aggravated assault and battery. 485 P.2d at 475–76. In so holding, the court stated: "Generally speaking, to constitute a crime the act must, except as otherwise provided by statute, be accompanied by a criminal intent on the part of the accused, or by such negligent and reckless conduct and indifference to the consequences of conduct as is regarded by the law as equivalent to a criminal intent." Id. (emphasis added) (citing 22 C.J.S. Criminal Law § 29). In my view, this general statement does not address whether Oklahoma law clearly or obviously provides that armed robbery can be committed negligently or recklessly.

In addition, the OCCA has held that taking of property from an unconscious person amounts to robbery only if the "unconsciousness was produced expressly for the purpose of taking the property in charge of such person." Mitchell v. State, 408 P.2d 566, 571 (Okla. Crim. App. 1965) (emphasis omitted) (quoting 2 Wharton's Criminal Law and Procedure (1927), § 554); see also Smith v. State, 519 P.2d 1370, 1374 (Okla. Crim. App. 1974). The court asserts that these cases are limited in scope to those involving unconscious victims. Ct. Op. at 25 n.17. Possibly, but the ambiguity as to their scope adds to the ambiguity of the mens rea requirements for Oklahoma's armed robbery statute.[1]

---

[1] The court seems to place the burden on the government to cite Oklahoma authority that is contrary to its interpretation of Traxler. See Ct. Op. at 24–27. But because Oklahoma's armed robbery statute does not clearly criminalize conduct beyond the scope of the ACCA, it is Mr. Campbell, and not the government, who "must at least point to his

Thus, at best for Mr. Campbell, it is ambiguous as to whether the OCCA has opined on this question, and such ambiguity is insufficient to satisfy our rigorous clear-error review standard. See Fagatele, 944 F.3d at 1240; see also [Redacted] v. [Redacted], 2022 WL 4546737, at *14 (D.D.C. Aug. 29, 2022) (identifying Oklahoma as one of several states that has not clarified the requisite mens rea for its robbery statutes).

The court also points to United States v. Sjodin, 139 F.4th 1188 (10th Cir. 2025), for support. Ct. Op. at 20–21. In Sjodin, this court determined that California caselaw permitted convictions under an assault statute with a mens rea below recklessness, thereby disqualifying it as a "violent felony" under the ACCA. 139 F.4th at 1202–03. In doing so, it rejected the government's argument that a different mens rea applied to the statute's use-of-force element. Id. at 1203–04. But the court's reliance on Sjodin here is unavailing for several reasons.

First, the court is not bound to graft an interpretation of a California assault statute onto Oklahoma's armed robbery statute. See United States v. Harris, 844 F.3d 1260, 1267–68 (10th Cir. 2017) (rejecting application of other state's law when applying categorical approach to Colorado robbery statute). Second, the court's determination that the assault statute did not require specific intent to cause injury has little bearing here. Sjodin, 139 F.4th at 1203. After all, the Oklahoma armed robbery statute proscribes a wrongful taking "accomplished by means of force or fear" which "must be employed

_____

own case or other cases in which the state courts in fact did apply the statute in the special . . . manner for which he argues." United States v. Mendez, 924 F.3d 1122, 1126 (10th Cir. 2019) (quoting Gonzales, 549 U.S. at 193).

5

either to obtain or retain possession of the property, or to prevent or overcome resistance to the taking." Okla. Stat. tit. 20, §§ 791–92. This language is directly at odds with the court's contention that the use of force or fear can be satisfied by recklessness or negligence. Rather, the statutory language hews more closely to the plurality decision in Borden v. United States, 593 U.S. 420 (2021), which held that there can be no reckless conduct, and therefore the ACCA applies, when the offense requires that the perpetrator "direct his action at, or target, another individual." 593 U.S. at 429. Third, the court in Sjodin determined that the California Supreme Court "plainly" established a single mens rea for the assault statute. 139 F.4th at 1203. But the OCCA has not done so here, and in the absence of a clear or obvious statement to the contrary, Mr. Campbell cannot meet the plain-error standard. See Fagatele, 944 F.3d at 1240.

Nor is the court's passing reference to the mere persuasive authority of the Model Penal Code sufficient to meet the plain-error standard. Ct. Op. at 19 n.12; see, e.g., Cheney v. State, 909 P.2d 74, 90 (Okla. 1995) (declining to adopt Model Penal code standard for adequate provocation). Under the Model Penal Code, an individual acts recklessly "when he 'consciously disregards a substantial and unjustifiable risk' attached to his conduct, in 'gross deviation' from accepted standards." Borden, 593 U.S. at 427 (quoting Model Penal Code § 2.02(2)(c)). As the plurality notes in Borden, reckless conduct is not aimed at another individual. Id. at 429. The definition of recklessness only adds to the ambiguity as to the mental state required for armed robbery, as the OCCA has not yet opined on whether a defendant can consciously disregard a substantial and unjustifiable risk of creating force or fear.

6

In sum, I cannot agree with the court's conclusion, which required a protracted discussion (including analysis of another state's caselaw) to justify, that the OCCA clearly or obviously determined that Oklahoma's armed robbery statute can be committed recklessly or negligently.  <u>See</u> Ct. Op. at 18–26.  In so doing, the court has unfortunately applied "legal imagination to [the] state statute's language."  <u>Babcock</u>, 40 F.4th at 1181. Because I am unpersuaded, I respectfully dissent on this issue.